UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
ISATOU BAH,

        Plaintiff,

      - against -

NORDSON CORP.,

        Defendant.               **00 Civ. 9060 (DAB)**
-------------------------------------X        <u>OPINION</u>
NORDSON CORP.,

        Third-Party Plaintiff,

      - against -

PLAZA PACKAGING CORP.,

        Third-Party Defendant.
-------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Plaintiff Isatou Bah ("Plaintiff") brings this product

liability action against Defendant Nordson Corporation

("Nordson") seeking damages for on-the-job injuries she suffered

when she was burned by hot glue discharged from a machine

designed and manufactured by Nordson.  Nordson in turn brings a

third-party negligence claim against Plaintiff's employer, Plaza

Packaging Corporation ("Plaza"), seeking indemnification and/or

contribution for any judgment that Plaintiff obtains against

Nordson.  Presently before the Court are Nordson's motion to

exclude the testimony of Plaintiff's expert on design defects and

inadequate warnings, and motions for summary judgment on

Plaintiff's claims against it and on its third-party claim against Plaza.  For the following reasons, Nordson's motion to exclude Plaintiff expert's testimony is GRANTED IN PART AND DENIED IN PART, and its motions for summary judgment are DENIED.

## I.  BACKGROUND

A.  Plaintiff's Accident and Nordson's Glue-Dispensing Machine

Plaintiff began working for Plaza in 1990, where she helped to assemble and pack cardboard boxes at Plaza's factory in the Bronx, New York. (Def. 56.1 Stmt ¶¶ 2; 17-18, 20; Pl. 56.1 Stmt ¶¶ 2, 17-18, 20; Continued Deposition of Isatou Bah ["Bah Cont. Dep."] at 61).  One of Plaintiff's box-assembly tasks was to remove glued cardboard boxes from a moving conveyor and insert a platform inside each of them. (Def. 56.1 Stmt ¶¶ 17, 20; Pl. 56.1 Stmt ¶¶ 17, 20; Deposition of Isatou Bah ["Bah Dep."] at 54).

The boxes were automatically glued together by a Nordson Model 2300 glue dispensing machine mounted on the conveyor. (Def. 56.1 Stmt ¶ 6; Pl. 56.1 Stmt ¶ 6; Deposition of Luis Altamirano ["Altamirano Dep."] at 14-16).  Nordson is one of only three American companies that manufacture hot glue dispensing machines. (Def. 56.1 Stmt ¶¶ 6-7; Pl. 56.1 Stmt ¶¶ 6-7).[1]  When a cardboard

---

[1] The other two companies are ITW and another "smaller entity." (Def. 56.1 Stmt ¶ 7; Pl. 56.1 Stmt ¶ 7; Gabryszewski Dep. at 72).

box was placed on the moving conveyor, it passed over an electrical sensor that triggered the Nordson 2300 dispenser to discharge hot melt glue out of nozzles on an extrusion gun mounted above the conveyor and into the box at a temperature that was never lower than the boiling point of water. (Def. 56.1 Stmt ¶¶ 8-9, 11; Pl. 56.1 Stmt ¶¶ 8-9, 11; Altamirano Dep. at 14-16; Deposition of Greg Gabryszewski ["Gabryszewski Dep."] at 10-11). Before being dispensed, the glue traveled from a reservoir tank located underneath the conveyor, through a hose, into the extrusion gun. (Pl. 56.1 Stmt ¶ 15, Ex. B (Expert Report of Dr. Anthony Storace) at 2). During her employment at Plaza, Plaintiff herself never operated or maintained a conveyor or Nordson 2300 glue dispensing machine. (Pl. 56.1 Stmt ¶ 20; Reply Affidavit of Howard Strongin ["Strongin Reply Aff."] ¶ 5).

The Nordson 2300 unit in use at Plaza's factory on the day of Plaintiff's accident- hereinafter, the "subject machine"-[2] was manufactured in 1987. (Def. 56.1 Stmt ¶ 10; Pl. 56.1 Stmt, Ex. C (Affidavit of Anthony Storace ["Storace Aff."]) ¶ 7). The machine contained several warning labels. At the bottom, underneath the reservoir tank, was a label that directed the user

---

[2] While Plaza had only one working 2300 unit in its factory on the day of Plaintiff's accident (Altamirano Dep. at 13), it currently has two. (Pl. 56.1 Stmt, Ex. B at 2).

to "remove pressure before opening" the machine's filter flush[3] and removing the adhesive filter, and warned that "failure to follow" such instructions "may result in serious burns." (Def. 56.1 Stmt ¶ 15; Pl. 56.1 Stmt ¶ 15, Ex. B, Photograph 10; Gabryszewski Dep. at 22). The same label also warned that the exposed metal area underneath the reservoir tank was greater than 60 degrees Celsius. (Pl. 56.1 Stmt, Ex. B, Photograph 10; Gabryszewski Dep. at 21). The hose meanwhile contained a red paper tag warning that "[f]ire, injury or equipment damage" could result if "cleanout materials" did not meet certain "requirements." (Pl. 56.1 Stmt ¶ 15, Ex. B, Photograph 14).[4]

The subject machine's extrusion gun and nozzles did not contain any warning labels. However, the Nordson 2300 Technical Manual, a copy of which was kept in the Plaza factory at the time of Plaintiff's accident, provided safety instructions for cleaning the machine's nozzles. Specifically, the Manual warned

---

[3] The "filter flush" is a drain valve that is opened to allow the flow of glue to flush clean the machine's adhesive filter. (Gabryszewski Dep. at 22; Strongin Reply Aff., Ex. P (Expert Report of Greg Gabryszewski), Attachment E (Nordson 2300 Maintenance Manual) at 1-2).

[4] These "requirements were as follows: (1) a "minimum flash point" of 550 degrees farenheit, (2) liquid and vapor that was "non-toxic at use temperature in equipment," (3) "chemical reactions with adhesive and equipment materials" that were not "violently heat producing," and (4) cleanout material that did not "corrode or otherwise weaken" equipment materials. (Pl. 56.1 Stmt, Ex. B, Attachment 14).

that "failure to relieve system pressure could result in serious burns when the nozzle is removed." (Pl. 56.1 Stmt ¶¶ 12-13, Ex. A (Nordson 2300 Technical Manual) at 5-6; Def. 56.1 Stmt ¶ 12). The Manual further instructed that the nozzles were to be cleaned by removing them from the extrusion guns, placing them in a cleaning solvent, and then cleaning their bores with a "pin-type probe inserted into the nozzle in a direction opposite to the flow of adhesive." (Pl. 56.1 Stmt, ¶ 13, Ex. A at 5-6). Alternatively, the Manual specified, the nozzle could be heated with a flameless electric heat gun and wiped with a clean cloth, or submerged in ultrasonic or chemical cleaner. (Id.). More generally, the Manual also warned that the extrusion guns "contain[ed] energized electrical components with potentials that could be fatal," and that machine users should "[d]isconnect and lock out input electrical power before maintenance on this equipment." (Strongin Reply Aff., Ex. P, Attachment E at 1).

While Plaintiff herself never received a copy of the Manual or any training concerning the operation and safety of the subject machine (Def. 56.1 Stmt ¶ 20; Pl. 56.1 Stmt ¶ 20), she was aware prior to her accident of just how hot the glue in the machine was. In 1995, while Plaintiff was placing a box on the conveyor to feed under one of Plaza's Nordson glue dispensing

machines,[5] the back of her right hand was burned by glue from the machine. (Def. 56.1 Stmt ¶ 18; Pl. 56.1 Stmt ¶ 18).

On the morning of September 27, 1999, Plaintiff was working next to the subject Nordson 2300 machine, removing automatically-glued boxes from the conveyor and inserting a platform inside each of them. (Def. 56.1 Stmt ¶ 17; Pl. 56.1 Stmt. ¶ 17). After returning from a break at around 10:30 AM, Plaintiff and several of her co-workers discovered that one of the subject machine's two working nozzles[6] was not working properly, at which point one of them called for Luis Altamirano, a Plaza mechanic, who discovered that the nozzle was clogged. (Deposition of Fara Castillo ["Castillo Dep."] at 27-28; Altamirano Dep. at 91; Bah Cont. Dep. at 55).

By September of 1999, Altamirano had been a mechanic at Plaza for fifteen years. (Altamirano Dep. at 12, 49). During his tenure at Plaza, he had never read any of the maintenance instructions in the Nordson 2300 Technical Manual but instead learned how to repair and clean Nordson glue dispensing machines exclusively through on-the-job training. (Id. at 33-34, 47-48,

---

[5] It is not clear from the record if this was in fact the same Nordson glue dispensing machine that was in use on the day of the accident out of which the present case arose.

[6] The subject machine actually had four nozzles, but only two of them were operational on the day of Plaintiff's accident. (Def. 56.1 Stmt ¶ 8; Pl. 56.1 Stmt ¶ 8)

51, 84-85).[7] Moreover, the procedure Altamirano followed when cleaning clogged nozzles was different from the one described in the Manual. Rather than removing the nozzle from the extrusion gun and submerging it in a cleaning solvent, Altamirano would simply unscrew the "clean out screw" at the top of the nozzle[8] while the nozzle was still attached to the machine and the machine was still turned on, and then clean the clogged glue out of the nozzle with a needle. (Id. at 19-20, 23, 33, 85-86; Def. 56.1 Stmt ¶ 30; Pl. 56.1 Stmt ¶ 30). Plaza mechanics used this alternative cleaning procedure because it only took a short time, while turning machine off during cleaning would result in long delays afterwards as the machine took time to reheat. (Altamirano Dep. at 19, 86; Def. 56.1 Stmt ¶ 31; Pl. 56.1 Stmt ¶ 31).

Thus, when Altamirano discovered a clog in one of the subject machine's nozzles on September 27, 1999, he retrieved a screwdriver and pin and began to unscrew the clean-out screw from the top of the nozzle while the machine was still turned on.

---

[7] Altamirano also attended a demonstration of the Nordson 2300 by a Nordson sales representative; however, the demonstration only covered how to assemble and operate the machine, not how to perform maintenance on it. (Altamirano Dep. at 35-36).

[8] Each nozzle is attached to the underside of the machine's extrusion gun. Hot glue enters through the rear of the nozzle, is turned ninety degrees downward, and then exits through an orifice on the bottom of the nozzle. Directly opposite from the orifice, on the top of the nozzle, is the clean-out screw. (Pl. 56.1 Stmt, Ex. B at 3).

(Altamirano Dep. at 94).  However, the conveyor was turned off. (Id. at 94-95).  Altamirano quickly removed the screw, but while he was cleaning the nozzle with the pin, Plaza employee Fara Castillo turned the conveyor back on, and an unidentified employee then placed a box on it. (Def. 56.1 Stmt ¶¶ 24-26; Pl. 56.1 Stmt ¶¶ 24-26).  Within a matter of seconds, the box moved over the subject machine's electronic sensor, activating the machine's pump.  The pump in turn pressurized the glue in the machine and pumped it out of the opening on the top of the nozzle where the clean-out screw had been. (Def. 56.1 Stmt ¶¶ 27; Pl. 56.1 Stmt ¶ 27; Altamirano Dep. at 27).  A stream of hot glue arched into the air and landed on Plaintiff, who was standing six feet away from the subject machine. (Def. 56.1 Stmt ¶¶ 27-28; Pl. 56.1 Stmt ¶¶ 27-28).  Plaintiff sustained burns on the right side of her neck and her right arm. (Def. 56.1 Stmt ¶ 29; Pl. 56.1 Stmt ¶ 29; Bah Dep. at 14-15; Affidavit of Alan Sirota ["Sirota Aff."] ¶ 14, Exs. C-I (Examining Physicians' Reports)). Following Plaintiff's accident, part of a cardboard box was placed over the subject machine's extrusion gun to prevent hot glue from shooting upwards out of a nozzle clean-out opening. (Pl. 56.1 Stmt, Ex. B, Photograph 3; Storace Aff. ¶ 13)

**B.  The Present Action**

On October 13, 2000, Plaintiff filed suit against Nordson in New York State Supreme Court, Bronx County, asserting causes of action for negligence, strict product liability, and breach of implied warranty based on the allegedly defective design of the subject glue dispensing machine and Nordson's alleged failure to provide adequate warnings about the danger of cleaning the nozzles while the machine was in operation.  (Verified Complaint ["Compl."] ¶¶ 6, 8-10, 12-14; Plaintiff's Responses to First Set of Interrogatories, Response no. 7).  Nordson removed the case to this Court on November 28, 2000, and filed its Answer on December 2, 2000.

Thereafter, on March 29, 2001, Nordson filed a Third-Party Complaint against Plaza, alleging that Plaza had been negligent in its use and operation of the subject machine, in failing to provide adequate training and instruction in the safe use of the machine, in its inspection, maintenance, cleaning and repair of the machine, and in its hiring of individuals to inspect, maintain, and repair the machine. (3rd Party Compl. ¶¶ 17-20).[9] Thus, Nordson seeks indemnification and/or contribution from

---

[9] Nordson also asserted a third-party claim against "John Doe Corporation," who was allegedly hired by Plaza to perform maintenance and repairs on the subject machine. (3rd Party Compl. ¶¶ 7, 28-38).  However, Nordson voluntarily dismissed this claim on June 11, 2001. (See Notice of Voluntary Dismissal, so-ordered by the Court on June 11, 2001).

Plaza for any judgment that Plaintiff obtains against it in the present action. (Id. ¶ 27).

C.    Plaintiff Expert's Testimony

Plaintiff has retained Dr. Anthony Storace to offer expert testimony on the alleged defectiveness of Nordson's design of the subject machine and the alleged inadequacy of Nordson's safety warnings concerning potential dangers associated with nozzle cleaning. Dr. Storace received his Ph.D. in Mechanical Engineering from the Polytechnic Institute of New York in 1977. He is licensed as a professional engineer in the State of New York, has taught a course in biomechanics at New York Medical College, and belongs to the American Society of Mechanical Engineers, Institute of Electrical and Electronic Engineers, and American Society of Safety Engineers. (Deposition of Anthony Storace ["Storace Dep."] at 60, 66-68; Affidavit of Howard Strongin ["Strongin Aff."], Ex. K (Storace Curriculum Vitae)).

Since 1991 Dr. Storace has worked as an independent contractor for Inter-City Testing and Consulting Corporation in Mineola, Minnesota, rendering expert engineering opinions in several personal injury lawsuits involving machine failure and performing other non-litigation related engineering consulting work. (Strongin Aff., Ex. K; Storace Dep. at 20-21, 64-65). From 1993 to 1995, he was also Director of Research and Development

for the Instrument/Sensor Division of Dresser Industries in Stamford, Connecticut, where he helped design sensor applications in machines used for hot adhesive dispensing, automobile paint spraying, coated paper spraying, wastewater processing, and hot asphalt liquid spraying. (Storace Aff. ¶¶ 6-7; Strongin Aff., Ex. K). From 1979 to 1985, Dr. Storace worked as the engineering manager of the Research and Development group of a Connecticut company called AMF, where he developed and performed safety and function evaluations for a variety of industrial and sports leisure products. (Strongin Aff., Ex. K.).

On August 18, 2000, Dr. Storace visited Plaza's factory where he spent two hours inspecting and photographing the subject machine and another Nordson 2300 unit. (Storace Dep. at 78-79; Pl. 56.1 Stmt, Ex. B at 1). Thereafter, Dr. Storace produced his expert report in which he opines that the Plaintiff's accident "was the result of design and warning defects in the subject glue dispenser." (Pl. 56.1 Stmt, Ex. B at 3). The subject machine was defectively designed, Storace argues, because it lacked "a means to prevent glue extrusion from the cleanout orifice." (Id.). Such means, he contends, could "take the form of an interlock switch that prevents the machine from being pressurized unless the cleanout screw is in place" or a "guard" over the cleanout screw orifice "to prevent inadvertent glue ejection." (Id.).

Interlocks were, he contends, commercially available and economically and technologically feasible in 1987. (Storace Aff. ¶¶ 7-9).

At his deposition Dr. Storace testified that the guard should be made of steel, and he discussed a third potential protective means, a diffuser placed over the nozzle's cleanout orifice that would cause any glue extruding from such opening to be diffused into a mist rather than "maintaining the integrity of a stream." (Storace Dep. at 185). As for the costs of his proposed safety devices, he testified that an interlock would cost "$5.00 to $10.00," a guard would cost "a couple of dollars" based on "the cost of steel," and the costs of the diffuser would be "minor" because Nordson "probably ha[d] the tooling in-house." (Id. at 188-189). His opinion that Nordson likely had the tooling for the nozzle diffuser "in-house" was in turn based on his knowledge of the equipment "generally found" in the machine shops of corporations. (Id. at 189). Storace also testified that the interlock switch had a rate of error of "one failure in 10 million applications" and that the error rate concept itself was inapplicable to a nozzle guard. (Storace Dep. at 167-169, 171). However, he was not asked about and did not provide any testimony on error rates for diffusers.

Dr. Storace did not create prototypes or drawings of any of

his proposed safety devices, nor did he test or review others' tests of any of these devices on a Nordson 2300 or similar hot glue dispensing machine. (Def. 56.1 Stmt ¶¶ 35, 37; Pl. 56.1 Stmt ¶ 35; Storace Dep. at 165, 170, 173, 175, 186). Storace also did not consult industry or OSHA standards concerning hot glue dispensing machines, inspect the glue application machines of Nordson's competitors, or obtain peer review of his or other engineers' opinions concerning his or similar proposed safety devices. (Def. 56.1 Stmt ¶¶ 38-40, 48; Pl. 56.1 Stmt ¶¶ 39-40, 48; Storace Dep. at 96-98, 166).

Storace himself did previously employ both a sensor interlock and diffuser on nozzles with removable cleanout caps as part of a hot adhesive-dispensing machine[10] he helped design while at Dresser Industries. (Storace Aff. ¶¶ 6, 14; Storace Dep. at 186-187). Moreover, since 1980, Storace has "participated in the design of many successful sensor applications" for safety interlocks in machines that, like the subject machine, required the "pneumatic spraying of a viscous liquid through a nozzle." (Storace Aff. ¶¶ 7, 9). However, he is not aware whether a nozzle guard like the one he proposes has ever been employed on any glue applicator. (Def. 56.1 Stmt ¶ 47;

---

[10] The machine that Storace helped design extruded a two-component adhesive mixture onto plastic sheeting used in the manufacture of swimming pool blankets. (Storace Aff. ¶ 7).

Pl. 56.1 Stmt ¶ 47; Storace Dep. at 165-166). Rather, he based his conclusion about the guard's technical feasibility on the fact that, following Plaintiff's accident, Plaza fashioned a "crude version of such a device" by cutting a cardboard box to fit around the subject machine's extrusion guns. (Storace Aff. ¶ 13).

As for the adequacy of Nordson's consumer safety warnings, Storace contends that a warning label should have been affixed to the subject machine's extrusion gun warning users that (1) nozzles should not be cleaned while still affixed to the gun, (2) no part of the machine should be removed before turning off the power, and (3) system pressure should be reduced to zero before removing nozzles from the gun. (Pl. 56.1 Stmt, Ex. B at 4; Storace Dep. at 139). However, he did not proffer any specific language for such a warning label because the Plaintiff did not ask him to do so. (Def. 56.1 Stmt ¶ 59; Pl. 56.1 Stmt ¶ 59; Storace Dep. at 132, 140).

Storace also testified that the warnings contained in the Nordson 2300 Technical Manual were inadequate. (Storace Dep. at 141). Specifically, he contended that the Manual's nozzle cleaning procedure was ambiguous about "whether the cleaning of the nozzle while still on the machine was prohibited by the manufacturer or not," and that its warning that "failure to

relieve system pressure could result in serious burns when the nozzle is removed" was too "passive." (Def. 56.1 Stmt ¶ 61; Pl. 56.1 Stmt ¶ 61; Storace Dep. at 113-114; 145-146). Storace recommended instead that the Manual use language like "boiling hot glue can squirt out of this machine" if system pressure is not relieved, and "never clean the nozzle while it is on the machine." (Storace Dep. at 146, 151-52; Def. 56.1 Stmt ¶ 61; Pl. 56.1 Stmt ¶ 61).

Storace has never designed or tested warnings for hot glue applicators himself nor determined whether others have done so. (Def. 56.1 Stmt ¶¶ 58-59; Pl. 56.1 Stmt ¶¶ 58-59; Storace Dep. at 135, 139, 147-148). Moreover, while Storace testified that he has designed "direct, assertive, active voice" warnings for other types of machines, including a warning about a rotating blade inside of a lawnmower, he has not designed warnings for any machines that apply hot liquid. (Storace Dep. at 139-140, 147).

## II. DISCUSSION

Nordson now seeks to exclude from evidence Dr. Storace's opinions on design defects and inadequate safety warnings, and at the same time moves for summary judgment on all of Plaintiff's product liability claims and its own negligence claim against Plaza. Because, on a summary judgment motion, a "district court

properly considers only evidence that would be admissible at trial," <u>Nora Beverages v. Perrier Group of America</u>, 164 F.3d 736, 746 (2d Cir. 1998), it is appropriate for a district court to decide questions regarding the admissibility of evidence, including expert opinion evidence, on a motion for summary judgment. <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997). In addition, as discussed further below, one of Nordson's arguments in support of summary judgment on Plaintiff's claims is that Plaintiff cannot establish a material issue of disputed fact without Storace's testimony. (Memorandum of Law of Defendant/Third Party Plaintiff Nordson Corp. in Support of Summary Judgment ["Def. Mem."] at 14-16). Accordingly, the Court will first address the admissibility of Dr. Storace's opinion evidence before ruling on Nordson's summary judgment motions.

A.   Admissibility of Storace's Expert Opinion Testimony

   1.   <u>Legal Standard</u>

   Like all evidence, the admissibility of an expert's opinion is determined by the district court, and any proponent of such evidence has the burden of establishing its admissibility by a preponderance of the proof. <u>See</u> Fed.R.Evid. 104(a), 702 Advisory Committee Notes; <u>Bourjaily v. United States</u>, 483 U.S. 171, 175-76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, the United States Supreme Court

defined the "gatekeeping role" of the district courts with respect to expert opinion evidence, declaring that "the Rules of Evidence- especially Rule 702- [] assign to the trial court the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[11]  Rule 702, amended following the <u>Daubert</u> decision, in turn provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles reliably to the facts of the case.

Fed.R.Evid. 702.

The focus of the reliability inquiry "must be solely on principles and methodology, not on the conclusions they generate," <u>Daubert</u>, 509 U.S. at 595.  The <u>Daubert</u> Court in turn listed four factors to guide district courts in assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be or has been tested; (2) whether it has

---

[11] Although originally applied only to scientific expert testimony, the gatekeeping inquiry discussed in <u>Daubert</u> is now also applied to "testimony based on 'technical' and 'other specialized' knowledge," including the testimony of engineering experts. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

been subjected to peer review and publication; (3) its known or potential rate or error; and (4) whether the theory or technique is generally accepted by the relevant scientific community. Id. at 593-594.  However, the Court noted that the Rule 702 admissibility inquiry is "a flexible one."  Id. at 594.  Thus, "the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the case, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150.  In other words, "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Id. at 153 (citation omitted).

     Ultimately, "the decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous." McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir. 1995); see also General Electric Co. v. Joiner, 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting that "abuse of discretion is the proper standard of review of a district court's evidentiary rulings").  Moreover, since Daubert, "the rejection of expert testimony is the exception rather than the rule," Fed.R.Evid 702 Advisory Committee Notes, and the Second Circuit requires that courts

assessing the reliability of expert testimony be mindful of the "presumption of admissibility of evidence." Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995), cert. denied, 517 U.S. 1229, 116 S.Ct. 1869, 134 L.Ed.2d 966 (1996).

### 2. Storace's Testimony on Design Defect

Nordson argues that Dr. Storace's opinion testimony about the three safety devices he contends could have been incorporated into the design of the Nordson 2300 glue dispenser is unreliable because none of his three proposals satisfy any of the four Daubert factors. Specifically, Storace never created and tested prototypes of his proposed guard, interlock, and nozzle diffuser, "nor did [he] rely upon testing or scientific data of others to substantiate his conclusions." (Def. Mem. at 4). In addition, Nordson contends, Storace "conceded that none of his theoretical designs. . . had ever been subjected to peer review," and that "none of his designs. . . had a known rate of error because he had never reduced his design to a prototype." (Id. at 10).

However, as Plaintiff correctly points out, the Daubert factors "do not all necessarily apply even in every instance in which reliability of scientific testimony is challenged," and in many cases, the reliability inquiry may instead "focus upon personal knowledge and experience" of the expert. Kumho Tire, 527 U.S. at 150; (Plaintiff's Memorandum ["Pl. Mem.] at 7). Indeed,

the drafters of the current Rule 702 emphasize that "nothing in this amendment is intended to suggest that experience alone-or experience in conjunction with other knowledge, skill, training, or education- may not provide a sufficient foundation for expert testimony. . . In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed.R.Evid. 702 Advisory Committee Notes; see also Kumho Tire, 527 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Moreover, "[i]n a product liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization affects the weight of the opinion, not its admissibility." Lappe v. American Honda Motor Co., 857 F.Supp. 222, 226 (N.D.N.Y. 1994), aff'd, 101 F.3d 682 (2d Cir. 1996).

In the present case, Dr. Storace has already successfully designed safety interlocks and diffusers for a hot adhesive dispenser and several other liquid-dispensing machines similar in nature and function to the subject machine. (Storace Aff. ¶¶ 6-7; Storace Dep. at 186-87). This extensive experience is clearly sufficient to establish the reliability of Dr. Storace's

testimony regarding these two devices even without consideration of the <u>Daubert</u> factors.[12]

The cases cited by Nordson do not support a different result. In <u>Colon v. BIC USA, Inc.</u>, the district court excluded the testimony of an engineering expert regarding two proposed alternative designs for a safety latch on a lighter because the expert had failed to test these designs. 199 F.Supp.2d 53, 75-78 (S.D.N.Y. 2001). The court emphasized that "[a]dherence to engineering standards of intellectual rigor almost always requires testing of a hypothesis if the expert cannot point to an existing design in the marketplace." <u>Id.</u> at 76. However, unlike the two proposed designs in <u>Colon</u>, the interlock switch and nozzle diffuser proffered by Dr. Storace do exist in the marketplace in products similar to the subject machine that he helped design, and thus testing is not needed to establish their feasibility.[13] Similarly, in each of the other cases cited by Nordson, the expert had not only failed to test his or her hypothesis, but he or she did not have experience with the design

_____

[12] Moreover, Storace testified that the potential rate of error for a safety interlock of the type he proposed for the subject machine would be one in ten million. (Storace Dep. at 171)

[13] The <u>Colon</u> court also noted that "[e]xpert engineering testimony may rest on scientific foundations <u>or on the personal knowledge or experience of the engineer</u>." 190 F.Supp.2d at 69-70 (<u>emphasis added</u>).

in question or one similar to it. See Brooks v. Outboard Marine Corp., 234 F.3d 89, 91 (2d Cir. 2000) (no indication that plaintiff's expert had any experience with the kind of boat or engine in question or similar boats and engines); Trumps v. Toastmaster, Inc., 969 F.Supp. 247, 252-53 (S.D.N.Y. 1997) (plaintiff's expert, a mechanical rather than electrical engineer, had never designed products similar to the electrical appliance at issue); Grdinch v. Bradlees, 187 F.R.D. 77, 80 (S.D.N.Y. 1999) (plaintiff's expert testifying about safety of defendant's retail product display had no experience in merchandise stocking); Cacciola v. Selco Balers, Inc., 127 F.Supp.2d 175, 181 (E.D.N.Y. 2001) (plaintiff's engineering expert testimony was "based neither upon any professional study or experienced-based observation"); Hutton v. Hoist Co., 158 F.Supp.2d 371, 375 (S.D.N.Y. 2001) (plaintiff's engineering expert testifying about adequacy of warnings on defendant's automotive lift had no experience or training with automotive lifts). In sum, none of these cases stand for the proposition that an engineering expert's opinion which does not otherwise satisfy the Daubert factors cannot still be reliable when it is based on the expert's relevant professional knowledge and experience.[14]

---

[14] Nordson also cites to cases from outside of the Second Circuit, which, because they are not binding authority on this

Nordson in turn argues that even if Dr. Storace can rely on his professional experience with interlocks and nozzle diffusers, he has not provided a sufficient factual basis for his conclusions about the technological or economic feasibility of incorporating these devices into the Nordson 2300 glue dispenser. Specifically, Nordson claims that Storace fails to identify the bases for his conclusion that the other machines into which he previously incorporated interlock switches and/or nozzle diffusers were similar to the subject machine. (Def. Reply at 4-6). Nordson also contends that Storace has not offered any information about the "estimated costs of production" associated with his proposed safety devices, which is a necessary basis for his conclusion that the devices are "economically feasible" for the Nordson 2300 glue dispensers. (Id. at 6).

Nordson is correct that expert testimony is only admissible under Rule 702 if it "is based upon sufficient facts or data." Fed.R.Evid. 702(1). Even a witness relying solely or primarily on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," because "the trial court's gatekeeping function requires more than simply taking the expert's word for it." Fed.R.Evid.

Court, will not be addressed.

702 Advisory Committee's Notes to 2000 Amendments (citations omitted).  Indeed, while "[t]rained experts commonly extrapolate from existing data, . . . nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Joiner, 522 U.S. at 146.  A trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proferred." Id.

However, Dr. Storace has in fact provided the requisite factual basis for his feasibility conclusions.  In his affidavit he explains the similarities between the subject machine and the machines for which he previously designed the interlock and nozzle diffuser by describing how, like the Nordson 2300, these latter machines also "required pneumatic spraying of a viscous liquid through a nozzle." (Storace Aff. ¶ 7).  He also describes how the hot adhesive dispensing machine he designed at Dresser Industries "ejected a hot, viscous adhesive mixture" through nozzles onto plastic sheeting that passed below, a process virtually identical to the automatic gluing of the cardboard boxes by the subject machine at the Plaza factory. (Id. ¶ 6).  Moreover, at his deposition, Storace offered specific production cost information for the interlock and nozzle diffuser, estimating a "$5.00 to $10.00" per unit cost for the former and a

one-time retooling cost associated with the latter that would be minor because Nordson likely already has the requisite tool in-house. (Storace Dep. at 188-189). These estimations were in turn based on Storace's previous experience designing such devices for the aforementioned liquid dispensing machines and his knowledge, acquired through more than two decades as a mechanical engineer for various machine manufacturing companies, of what tools such manufacturers typically keep in-house. (Id. at 189; Strongin Aff., Ex. K).

In the end, Nordson has not shown that Dr. Storace's feasibility conclusions are wholly speculative or conjectural, and to the extent Nordson contends they are still based on "unfounded assumptions" about product similarity and production costs, such contentions "go to the weight, not the admissibility, of the testimony." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996). Indeed, as the Daubert Court itself emphasized, "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof," rather than "wholesale exclusion" are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596 (citations omitted). Accordingly, Dr. Storace's testimony regarding safety interlocks and nozzle diffusers is admissible under Rule 702.

However, the Court finds that Dr. Storace's testimony regarding the metal nozzle guard is not reliable.  Not only do his opinions about the guard not satisfy any of the <u>Daubert</u> factors (<u>see</u> Storace Dep. at 165-168), but he has failed to explain specifically how they stem from his professional experience.  Instead, his conclusion about the feasibility of incorporating such a guard into the Nordson 2300 glue dispenser is based solely on his having observed during his one visit to Plaza a guard made out of part of a cardboard box placed over the extrusion gun of a Nordson 2300. (Storace Aff. ¶ 13).[15] Accordingly, Dr. Storace's testimony regarding a metal nozzle guard as a design alternative for the Nordson 2300 glue dispensing machine is inadmissible.

### 3.   <u>Storace's Testimony Regarding Inadequate Warnings</u>

As with Storace's testimony on alternative safety designs, Nordson attacks his testimony on the inadequacy of the subject machine and Technical Manual's safety warnings for not satisfying any of the <u>Daubert</u> factors.  Nordson correctly points out that Storace never designed and tested warnings for the Nordson 2300 or reviewed others' research on safety warnings for hot glue

_____

[15] During his deposition, Storace simply testified that it was "self-evident" that a metal nozzle guard was a feasible design alternative for the subject machine. (Storace Dep. at 174).

applicators, and that his warning proposals were never subjected to peer review and had no known rate of error. (Def. Mem. at 4-5, 10).

Plaintiff again relies on Dr. Storace's prior professional experience designing machine safety warnings. (Pl. Mem. at 14). However, unlike his testimony about the interlocks and nozzle diffusers, Storace has not shown how his prior experience designing safety warnings is relevant to the present case. At his deposition, Storace testified that he has never designed warnings for glue applicators or any other machines that apply hot liquid, and the only machine that he specifically mentioned having designed a warning for was a lawn mower with a rotating blade. (Storace Dep. at 135, 139-140, 147-148). Plaintiff characterizes the dangers of the lawnmower and the Nordson 2300 glue dispenser as "comparable" because both can be "inadvertently energized and caus[e] harm." (Pl. Mem. at 14). However, as demonstrated by Plaintiff's accident, the Nordson 2300 poses risks to bystanders standing several feet away from it, while the lawnmower would presumably only injure those who actually stuck their hands into the area of the machine housing the rotating propeller. Thus, the nature of the safety risks posed by the Nordson 2300- and therefore the necessary information for its

safety warnings- are quite different than those of the lawnmower
with which Dr. Storace previously worked.

While an engineering expert in a product liability case "is
not strictly confined to his area of practice" and "may testify
concerning related applications," Lappe, 857 F.Supp. at 227, he
or she is not exempt from the requirement of providing a
sufficient basis for his or her conclusions. See Joiner, 522 U.S.
at 144; Santoro v. Donnelly, 340 F.Supp.2d 464, 475 (S.D.N.Y.
2004).  Thus, where, as here, an expert purports to base his
conclusions solely on his general professional "experience"
without explaining specifically why he can extrapolate from such
experience, Rule 702 bars him from testifying. See Santoro, 340
F.Supp.2d at 475 (excluding testimony on inadequate safety
warnings of expert who relied solely on "general experience in
the field of communications" without explaining what specifically
in his prior experience supported his conclusions); Grdinich, 187
F.R.D. at 80-81 (excluding testimony of expert with general
experience in display case designing where record revealed his
experience did not include design of display cases for products
similar to the one at issue).  In essence, there is "too great an
analytical gap" between Storace's previous warning design
experience and his present conclusions about the adequacy of the

Nordson 2300's safety warnings for the Court to admit such conclusions into evidence in this case. <u>Joiner</u>, 522 U.S. at 146.

Plaintiff also argues that because Dr. Storace's testimony on the Nordson 2300's design defects is admissible, he must necessarily be permitted to testify about the adequacy of the machine's warnings. (Pl. Mem. at 11-12). However, Plaintiff has failed to cite any authority supporting this argument, and New York law.[16] recognizes design defect and failure to warn as separate and distinct causes of action for product liability. <u>See</u> <u>McCarthy v. Olin Corp.</u>, 119 F.3d 148, 154 (2d Cir. 1997); <u>Schumacher v. Richards Shear Co., Inc.</u>, 59 N.Y.2d 239, 256, 464 N.Y.S.2d 437 (1983) (noting that the duty to warn is "conceptually different from the duty to properly design or manufacture a product."). Thus the Court sees no inconsistency in admitting Dr. Storace's testimony on design defects while barring him from testifying about inadequate warnings.

Accordingly, Dr. Storace's testimony regarding the inadequacy of the safety warnings on the Nordson 2300 and in its Technical Manual is inadmissible under Rule 702.

---

[16] Because the Court's jurisdiction over the present case is based on diversity of citizenship, it must, unless otherwise agreed to by the parties, apply the substantive law of the forum state, which in this case is New York. <u>See</u> <u>Salve Regina College v. Russell</u>, 499 U.S. 225, 226, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991)(citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

B.    Summary Judgment

    1.    Legal Standard

        A district court should grant summary judgment when
there is "no genuine issue as to any material fact," and the
moving party is entitled to judgment as a matter of law.
Fed.R.Civ.P. 56(c); see also Hermes Int'l v. Lederer de Paris
Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000).  Summary
judgment is appropriate only when, "after drawing all reasonable
inferences in favor of a non-movant, no reasonable trier of fact
could find in favor of that party." Heublein v. United States,
996 F.2d 1455, 1461 (2d Cir. 1993) (citing Matsushita Elec.
Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106
S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

        In assessing when summary judgment should be granted, "there
must be more than a 'scintilla of evidence' in the non-movant's
favor; there must be evidence upon which a fact-finder could
reasonably find for the non-movant." Id. (citing Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91
L.Ed.2d 202 (1986)).  A court must always "resolv[e] ambiguities
and draw[ ] reasonable inferences against the moving party,"
Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986)
(citing Anderson); however, the non-movant may not rely upon
"mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment." Id. at 12.
Instead, when the moving party has documented particular facts in
the record, "the opposing party must, 'set forth specific facts
showing that there is a genuine issue for trial.'" Williams v.
Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting Fed.R.Civ.P.
56(e)).  Furthermore, Fed.R.Civ.P. 56(e) requires that
"[s]upporting and opposing affidavits. . . shall set forth such
facts as would be admissible in evidence, and shall show
affirmatively that the affiant is competent to testify to the
matters stated therein."

### 2.  Plaintiff's Design Defect and Breach of Implied Warranty Claims

As discussed in Part I.B. supra, Plaintiff brings claims for
negligence, strict liability and breach of implied warranty based
on the allegedly defective design of the subject machine.  "In a
design defect case, there is almost no difference between a prima
facie case in negligence and one in strict liability." Searle v.
Suburban Propane Div. of Quantum Chemical Corp., 263 A.D.2d 335,
338, 700 N.Y.S.2d 588 (3d Dep't 2000) (citations omitted); see
also Denny v. Ford Motor Co., 87 N.Y.2d 248, 258, 639 N.Y.S.2d
250 (1995) ("[I]n general, the strict liability concept of
'defective design' is functionally synonymous with the earlier
negligence concept of unreasonable designing.") (citation

omitted).  Thus, to prevail on a negligence or strict liability claim for design defect under New York law, a plaintiff must demonstrate that (1) the product as designed was not "reasonably safe"; and (2) the defective design was a substantial factor in causing the plaintiff's injuries. <u>Voss v. Black & Decker Mfg. Co.</u>, 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398 (1983) (citations omitted).  The "reasonably safe" inquiry in turn focuses on whether "if the design defect were known at the time of manufacture, a reasonable person would have concluded that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." <u>Id.</u>  Thus, the plaintiff is "under an obligation to present evidence that. . . there was a substantial likelihood of harm" when the product was put to its intended use and "it was feasible to design it in a safer manner." <u>Id.</u>

A breach of implied warranty claim, on the other hand, does not involve a risk-benefit analysis but instead "requires an inquiry only into whether the product in question was fit for the ordinary purposes" for which it is used. <u>Denny</u>, 87 N.Y.2d at 258 (citation and internal quotations omitted).  Recovery may in turn "be had upon a showing that the product was not minimally safe for its expected purpose- without regard to the feasibility of alternative designs or the manufacturer's reasonableness in

marketing it in that unsafe condition." <u>Id.</u> at 258-59. Thus, while there is clearly a high degree of overlap between the breach of implied warranty and strict liability/negligence causes of action for design defect, "it is possible to be liable for breach of implied warranty even though a claim of strict liability has not been satisfactorily established." <u>Id.</u> at 251.

In the present case, Nordson argues that it is entitled to summary judgment on Plaintiff's three design defect claims because Plaintiff cannot provide any evidence that feasible safer design alternatives for the Nordson 2300 existed at the time of the subject machine's manufacture in 1987. More specifically, Nordson contends that (1) the only evidence Plaintiff purports to offer on the issue, the expert testimony of Dr. Storace, is inadmissible, and (2) Storace's testimony, even if admissible, provides only "conclusory and speculative" claims as to the economic and technical feasibility of his proposed alternative safety designs. (Def. Mem. at 14-16; Def. Reply at 4-7).

Nordson's arguments fail for three reasons. First, as just discussed, whether or not there were feasible safer alternative designs for the Nordson 2300 is irrelevant to the merits of Plaintiff's breach of implied warranty claim. Second, the Court has already ruled that Dr. Storace's testimony on two purportedly feasible alternative safety designs for the Nordson 2300, the

safety interlock and nozzle diffuser, is admissible under Federal Rule of Evidence 702.

Finally, the Court disagrees with Nordson's characterization of Dr. Storace's testimony on the feasibility of his proposed safety devices as "conclusive" and "speculative." As discussed in Part II.A.2 supra, Storace did provide a specific factual basis for his conclusions about the technical feasibility of incorporating the safety interlock and nozzle diffuser into the Nordson 2300 glue dispenser, namely his own professional experience incorporating such devices into machines which, like the subject machine, dispensed hot viscous liquid through nozzles. Similarly, in his affidavit, Storace explains how his experience employing safety interlocks in hot adhesive dispensing machines since 1980 allow him to conclude that such devices were available at the time the subject machine was manufactured in 1987. (Storace Aff. ¶ 9). Moreover, Storace provided specific production cost information for both the safety interlock and nozzle diffuser which he again based on his own two decades worth of experience designing such devices for machines similar in features and function to the Nordson 2300 glue dispenser. Thus, overall, a reasonable jury could conclude from Dr. Storace's testimony that his proposed alternative designs were available

and economically and technically feasible at the time of the
subject machine's manufacture in 1987.

Accordingly, Nordson is not entitled to summary judgment on
Plaintiff's strict liability, negligence, or breach of implied
warranty claims for design defect.


### 3. Plaintiff's Failure to Warn Claim

Plaintiff also asserts that Nordson was negligent in failing
to provide adequate warnings either on the subject machine itself
or in the Technical Manual about the dangers of cleaning the
machine's nozzles while the machine was in operation.  To make a
prima facie case for negligent failure to warn under New York
law, a plaintiff must show that (1) the manufacturer had a duty
to warn; (2) the manufacturer breached such duty so that the
product is rendered defective, i.e. reasonably certain to be
dangerous; (3) the defect was the proximate cause of the
plaintiff's injury; and (4) that the plaintiff suffered loss or
damage. McCarthy, 119 F.3d at 156 (citing Becker v. Schwartz, 46
N.Y.2d 401, 410, 413 N.Y.S.2d 895 (1978)); Santoro, 340 F.Supp.2d
at 484-85.

"A manufacturer has a duty to warn against latent dangers
resulting from foreseeable uses of its product of which it knew
or should have known," including the "danger of unintended uses .

35

. . provided these uses are reasonably foreseeable." <u>Liriano v. Hobart Corp.</u>, 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764 (1998). The duty to warn is in turn breached either by "the complete absence of warnings as to a particular hazard" or "the inclusion of warnings which are insufficient." <u>Johnson v. Johnson Chemical Co., Inc.</u>, 183 A.D.2d 64, 69, 588 N.Y.S.2d 607 (2d Dep't 1992). New York Courts have yet to establish a firm standard of product warning adequacy. <u>See</u> <u>Cover v. Cohen</u>, 61 N.Y.2d 261, 275, 473 N.Y.S.2d 378 (1984); <u>Lancaster Silo & Block Co. v. Carter-Wallace, Inc.</u>, 75 A.D.2d 55, 427 N.Y.S.2d 1009 (4th Dep't 1980). However, they have generally required that warnings "clearly alert the user to avoid certain uses of the product which would appear to be normal and reasonable," and have typically weighed factors such as "the degree of danger" and type of product involved in making the adequacy determination. <u>Lancaster Silo</u>, 75 A.D.2d at 65; <u>Cover</u>, 61 N.Y.2d at 276.

New York law also recognizes two situations in which failure to warn claims are barred as a matter of law: (1) where the injured party was fully aware of the hazard through general knowledge, observation or common sense; and (2) where the danger at issue falls within the "limited class of hazards [that] need not be warned of as a matter of law because they are patently dangerous or pose open and obvious risks." <u>Liriano</u>, 92 N.Y.2d at

241.  An obvious risk is one "that would ordinarily be seen and the danger of which would ordinarily be appreciated by those who would be expected to use the product." Id. at 241-242.

Nordson makes three arguments in support of its motion for summary judgment on Plaintiff's failure to warn claim.  First, it contends that because the only evidence Plaintiff offers on the alleged inadequacy of the subject machine and Technical Manual's safety warnings-Dr. Storace's testimony- is inadmissible, there is no disputed issue of fact as to adequacy of such warnings. (Def. Mem. at 14-16).  However, "[t]he adequacy of the warning in a products liability case based on a failure to warn is, in all but the most unusual circumstances, a question of fact to be determined at trial," Cooley v. Carter-Wallace Inc., 102 A.D.2d 642, 478 N.Y.S.2d 375 (4th Dep't 1984); Johnson, 183 A.D.2d. at 69 (same), and "the jury does not need expert testimony to find a warning inadequate, but may use its own judgment concerning all the circumstances." Billiar v. Minnesota Mining and Mfg. Co., 623 F.2d 240, 247 (2d Cir. 1980) (citing Rainbow v. Albert Elia Building Co., 49 A.D.2d 250, 373 N.Y.S.2d 928 (4th Dep't 1975) ("recovery [under a failure to warn theory] ultimately depends upon a subjective determination by the trier of facts of what constitutes reasonable warning under all the circumstances."); and Young v. Elmira Transit Mix, Inc., 52 A.D.2d 202, 383

N.Y.S.2d 729 (4th Dep't 1976)(same)).  Therefore, in the present
case, there is no reason why the adequacy of the subject machine
and Technical Manual's safety warnings should not also be
determined by a jury.

Second, Nordson argues that Plaintiff is barred as a matter
of law from asserting a failure to warn claim because she was
"actually aware" of the hazards of Nordson 2300 glue dispenser
based on her prior accident in 1995 and because the danger of
being burned by hot glue discharged from the subject machine was
"open and obvious" since "common sense dictates that hot glue can
cause skin burns." (Def. Mem. at 18).  However, Nordson's
argument is based on overly-broad characterization of the hazard/
danger actually at issue in this case.  The risk that Plaintiff
contends Nordson needed to issue warnings about was not simply
the danger of working with hot glue, but the risk of cleaning the
Nordson glue dispensing machine's nozzles while the machine was
still in operation.  Meanwhile, Plaintiff's 1995 accident, which
did not involve nozzle cleaning, did not inform her of the risks
involved in cleaning the nozzles of a Nordson 2300 that is
powered-on.  Indeed, in 1995, Plaintiff had placed her hand in
close proximity to the glue dispensing machine when she was
burned, whereas in the instant case, she was standing
approximately six feet away from the machine at the time the glue

stream arched and burned her. (Def. 56.1 Stmt ¶¶ 18, 27-28; Pl. 56.1 Stmt ¶¶ 18, 27-28). Moreover, being burned by hot glue discharged during nozzle cleaning was hardly an "open and obvious" risk to Plaza employees since there is no indication in the record that, prior to Plaintiff's accident, any Plaza employee was injured in this fashion, and Plaza mechanics for many years prior to Plaintiff's accident cleaned nozzles while the Nordson 2300 glue dispensing machines were powered on.

Finally, Nordson argues that because Plaintiff was not a user of the subject machine but only a bystander, Nordson did not have a duty to warn her of any of the potential dangers associated with the machine. (Def. Reply at 1-3). In support of this argument, Nordson cites to <u>Hamilton v. Beretta U.S.A. Corp.</u>, 96 N.Y.2d 222, 727 N.Y.S.2d 7 (2001), in which, Nordson claims, the New York Court of Appeals "expressly declined to expand the scope of a manufacturer's duty to warn to non-users." (Def. Reply at 2). However, Nordson mischaracterizes the <u>Hamilton</u> holding. The case involved a negligent marketing claim rather than a failure to warn claim, and the New York Court of Appeals held only that handgun manufacturers do not owe victims of handgun violence and their families a duty to exercise reasonable care in the marketing of their products. 96 N.Y.2d at 230-31. Moreover, the <u>Hamilton</u> Court actually distinguished the case

before it from a product liability action based on a failure to warn theory, apparently seeing more justification in the latter case for the imposition of a duty of care that extended beyond mere users of the product at issue. Id. at 235.

Meanwhile, New York Courts have allowed a failure to warn claim by a bystander plaintiff injured by a product produced by a defendant manufacturer but used by third parties. See LaPaglia v. Sears Roebuck and Co., Inc., 143 A.D.2d 173, 531 N.Y.S.2d 623 (2d Dep't 1988) (upholding jury verdict in favor of bystander plaintiff who brought failure to warn claim against manufacturer of lawnmower owned and driven by co-defendant at time of plaintiff's injury); Cover v. Cohen, 61 N.Y.2d at 274-75 (acknowledging that bystander plaintiff's failure to warn claim against manufacturer of car driven by co-defendant would be submitted to a jury).  In addition, the Restatement Second of Torts specifies that a supplier of dangerous chattel may be found liable for negligent failure to warn "to those whom the supplier should expect to use the chattel. . . or to be endangered by its probable use," so that the supplier's duty to warn requires him "to give to those who are to use the chattel the information. . . which he should realize to be necessary to make its use safe for them and those in the vicinity it is to be used."  Restatement 2d Torts § 388 cmt. g (1965) (emphasis added).

Plaintiff's situation in the present case is analogous to that of the plaintiffs in _LaPaglia_ and _Cover_. Moreover, as a Plaza employee who worked frequently in close proximity to Nordson 2300 glue dispensing machines, Plaintiff clearly meets the Restatement's definition of a person "in the vicinity" in which such machines were being used. Therefore, the Court sees no reason why Plaintiff, though not a user of the subject machine, cannot still bring a negligent failure to warn claim against Nordson.

Accordingly, Nordson is not entitled to summary judgment on Plaintiff's failure to warn claim.

### 4.    Nordson's Negligence Claim against Plaza

Finally, Nordson seeks summary judgment in its favor on its negligence claim against Plaza. Nordson contends that "the undisputed facts" in the record prove that (1) Plaza failed to train Plaintiff or the subject machine's operators or mechanics adequately "in the safety and operation" of the machine, and (2) this failure was a proximate cause of Plaintiff's injuries. (Def. Mem. at 22-23).

Plaza, meanwhile, argues that whether it exercised reasonable care in training and supervising its employees in the operation and maintenance of the subject machine is "a question

of fact for the jury."  (Memorandum of Law by Third-Party Defendant Plaza Packaging Corp. in Opposition to Summary Judgment ["Plaza Mem."] at 2-3).  In addition, Plaza requests in its opposition memorandum of law that summary judgment be granted in its favor on Nordson's claim because such claim is barred by New York State Workers' Compensation Law § 11 since there is no evidence in the record that Plaintiff suffered a "grave injury" as defined by the statute. (Plaza Mem. at 4-6).

Section 11 of the Workers' Compensation Law provides that:

A employer shall not be liable for contribution or indemnity to any third person based upon liability for injuries sustained by an employee acting within the scope of his or her employment for such employer unless such third person proves through competent medical evidence that such employee has sustained a "grave injury" which shall mean only one or more of the following: death, permanent or total loss of use or amputation of an arm, leg, hand or foot, loss of multiple fingers, loss of multiple toes, paraplegia or quadriplegia, total or permanent blindness, total and permanent deafness, loss of nose, loss of ear, permanent and severe facial disfigurement, loss of an index finger or an acquired injury to the brain caused by an external physical force resulting in permanent total disability.

N.Y. Workers' Comp. Law § 11 (McKinney 2004).  The statute's list

of grave injuries "'is exhaustive, not illustrative.'" <u>Ibarra v.</u>

<u>Equipment Control, Inc.</u>, 268 A.D.2d 13, 18, 707 N.Y.S.2d 208 (2d

Dep't 2000) (quoting Governor's Memorandum approving L. 1996, ch.

635, McKinney's Session Laws of N.Y., at 1913).  Moreover, "the

burden falls on the third party seeking contribution or

indemnification against an employer to establish a 'grave

injury.'"  <u>Id.</u> at 17.

     In the present case, Nordson has not provided any "medically

competent" evidence that Plaintiff suffered one or more of the

"grave injuries" enumerated in the statute.  All of the reports

of physicians who examined Plaintiff following her accident note

that she suffered burns only on her neck, behind her right ear,

and on her right arm, and that burns left scars on her neck and

arm. (Sirota Aff., Exs. C-I).  As the language of the statute

makes clear, burns that cause scarring to parts of the body other

than the face and do not result in the loss of use or amputation

of limbs do not constitute "grave injuries."  Therefore,

Nordson's negligence claim against Plaza is indeed barred by § 11

of the New York Workers' Compensation Law.

     Nordson in turn argues that Plaza is procedurally barred

from seeking summary judgment because it did not move for such

relief by notice of cross motion.  (Def. Reply at 9-10).

However, it has long been the law of this Circuit that "as long as some party has made a motion for summary judgment, a court may grant summary judgment to a non-moving party, provided that party has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." <u>First Financial Insur. Co. v. AllState Interior Demolition Corp.</u>, 193 F.3d 109, 115 (2d Cir. 1999); <u>see also</u> <u>Coach Leatherware Co. v. AnnTaylor, Inc.</u>, 933 F.2d 162, 167 (2d Cir. 1991) (noting that a district court's <u>sua sponte</u> granting of summary judgment in favor of a non-moving party is "an accepted method of expediting litigation," as long as "the facts before the district court were fully developed so that the moving party suffered no procedural prejudice"); <u>Lowenschuss v. Kane</u>, 520 F.2d 255, 261 (2d Cir. 1975) ("We have sanctioned a <u>sua sponte</u> award by the court of summary judgment to a non-moving party where it appeared from the papers, affidavits, and other proofs submitted by the parties that there were no disputed issues of material fact and that judgment for the non-moving party would be appropriate as a matter of law.").

Nordson has certainly had a full and fair opportunity to establish a disputed issue of fact as to whether Plaintiff suffered a grave injury from her accident. After Plaza put Nordson on notice of the "grave injury" issue in its opposition

to Nordson's summary judgment motion, Nordson could have submitted "competent medical evidence" of a grave injury to Plaintiff in its reply papers but did not do so. See Bridgeway Corp. v. Citibank, 201 F.3d 134, 140 (2d Cir. 2000) (holding that likelihood plaintiff was procedurally prejudiced by court's sua sponte granting of summary judgment was "virtually nil" where issue upon which court based its decision was raised in defendant's memorandum of law in opposition to plaintiff's summary judgment motion). Moreover, the severity of Plaintiff's injury has been a relevant issue to all parties since the outset of this action since it directly affects Nordson's exposure to damages on Plaintiff's claims, and Nordson had ample opportunity to obtain the competent medical evidence about her injury during the seven months of formal discovery in this case.

Nordson has therefore provided no "indication that [it] might otherwise bring forward evidence that would effect the [C]ourt's summary judgment determination," and, as such, there is nothing  procedurally improper about the Court's granting summary judgment in Plaza's favor. Coach Leatherware, 933 F.2d at 167. Accordingly, the Court finds that Plaza is entitled to summary judgment in its favor on Nordson's negligence claim.

## III. CONCLUSION

For the reasons stated above, Nordson's motion to exclude the testimony of Plaintiff's expert, Dr. Anthony Storace, is **GRANTED IN PART AND DENIED IN PART** as follows:

(1)  Dr. Storace's testimony on a proposed metal nozzle guard for the Nordson 2300 glue dispensing machine inadmissible;

(2)  Dr. Storace's testimony on the adequacy of Nordson's warnings concerning nozzle cleaning is inadmissible;

(3)  Dr. Storace's testimony regarding a proposed interlock switch and nozzle diffuser for the Nordson 2300 glue dispensing machine is admissible.

Nordson's motions for summary judgment on Plaintiff's claims against it and its claim against Plaza are DENIED.  Summary judgment is GRANTED in favor of Plaza on Nordson's negligence claim against it, and Plaza is therefore dismissed as a third-party defendant to this action.

Within sixty (60) days of the date of this Order, Plaintiff and Nordson shall jointly file a Joint Pre-trial Statement ("JPTS"), and shall each separately file and serve on the opposing side proposed requests to charge, a proposed voir dire, and a memorandum of law addressing the issues raised in the JPTS. The JPTS shall conform to the Court's Individual Rules.

Responses to the pre-trial memoranda of law shall be filed and served by each party within ninety (90) days of the date of this Order.

SO ORDERED

DATED:     New York, New York
           August 1 , 2005

                                    _Deborah A. Batts_
                                     Deborah A. Batts
                              United States District Judge